UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

JAMES C. MAVEL,
        -Plaintiff

    -v-                                                    3:07-CV-352 (CFD)

SCAN-OPTICS, INC.
and SCAN-OPTICS, LLC.,
        -Defendants

## RULING ON MOTIONS FOR PRE-JUDGMENT REMEDY AND FOR DISCLOSURE OF ASSETS

An evidentiary hearing was held on plaintiff's motion for a prejudgment remedy (Dkt. #5) and for a disclosure of assets (Dkt. #6) on August 27, 2007. Four witnesses testified, and numerous documents were received into evidence. Based on the credible evidence, the motion is granted. A writ of attachment shall issue permitting the plaintiff to attach assets of the defendants to the value of $1,800,000. The motion for disclosure of assets is also granted.

"In order to obtain a prejudgment remedy, the applicant need only establish the validity of [its] claim." Dunican v. Bernhard-Thomas Bldg. Sys., LLC, No. CV030568019S, 2004 WL 574724, at *1 (Conn. Super. Ct. March 10, 2004). "[I]f probable cause is established that judgment will be rendered in the applicant's favor

in the amount sought, the prejudgment remedy should be granted."
Id.

"Probable cause is nothing more than a bona fide belief of the existence of facts essential under the law for the action, such as would warrant a person of ordinary caution, prudence, and judgment, under the circumstances, to entertain it." Id. at *2. To be entitled to a prejudgment remedy, the applicant must establish probable cause as to both liability and damages. Neely v. The 36 Catoonah Street Co., No. 31 45 74--AC 13246, 1994 WL 131212, at *2 (Conn. Super. Ct. Apr. 12, 1994) citing McCahill v. Town & Country Assocs., Ltd., 185 Conn. 37, 39 (1981). Although mathematical precision is not required in determining the amount of damages, Burkert v. Petrol Plus of Naugatuck, Inc., 5 Conn. App. 296, 301 (1985), the record nevertheless must be such that the court can make a fair and reasonable estimate of probable damages. In doing so, the court must also take into account any likely defenses and reasonable set-offs which are shown by the opposing party.

The plaintiff has amply sustained his burden of proof.[1] The plaintiff's proposed findings of fact (Dkt. #29) are firmly

---

[1] The magistrate judge has considered the arguments submitted in SOL's September 12, 2007 reply papers. (Dkt. #31.) These papers mostly reiterate SOL's earlier arguments. Nothing therein changes the conclusions or analysis in the magistrate judge's ruling. Plaintiff's reply papers (Dkt. #32) also basically reiterate his earlier arguments. Plaintiff has sustained his burden of showing probable cause on his contract claim and on the issue of successor liability.

grounded in the documentary evidence adduced at the hearing, and supported by the credible testimony of all the witnesses, even those called by the defendant. The undersigned adopts the plaintiff's proposed findings as if they were set out in detail herein.

The uncontroverted evidence establishes that the defendant Scan-Optics, Inc. ("SOI") entered into a written employment agreement with the plaintiff. The agreement was drafted entirely by SOI, without the plaintiff's having played any part in negotiating it. The agreement, which was entered into evidence as Exhibit 1, is among the more convoluted and detailed that the undersigned has seen.[2] Try though the defendants do to escape the contract's implications, they cannot. The language of the contract supports the plaintiff, and, for present purposes, so too do the facts. Though defendants may regret the contract's scope or, in retrospect, believe that the benefits it confers on the plaintiff are undeservedly generous, the plaintiff has easily met his burden of showing probable cause that he is likely to prevail for the

---

[2] The papers submitted by Scan-Optics, LLC ("SOL") in opposition to the pending motion recognize that, if plaintiff properly terminated his employment agreement for good cause, he would be entitled to claim a severance payment from SOI. (Dkt. #28 at ¶8). SOL's papers in opposition to the pending motion do not appear to contest the formula that plaintiff uses in calculating the amount of severance compensation, interest, or attorney's fees that plaintiff claims.

amount of the attachment he seeks.

Among other things, the agreement provides that the plaintiff would serve as SOI's President and Chief Executive Officer beginning December 21, 1996 and continuing thereafter until his employment was terminated by either party in accordance with the agreement. The agreement provided for certain severance payments if there were a change of control of SOI. It also provided that the plaintiff would receive a severance payment in certain other circumstances. These included adverse changes in the scope of plaintiff's duties, powers and responsibilities occurring in the aftermath of a "change of control" of SOI. The obligation to make a severance payment could also be triggered by the employer's taking of any action that adversely affected plaintiff's participation in any incentive pay, or employee benefit plan or program in which he was participating.

The evidence adduced at the hearing makes it clear that there was such a change of control of SOI, and that during the relevant period after that change of control, there were several actions taken that adversely affected, diminished, and reduced plaintiff's powers, duties, and responsibilities. The intricacies of these actions are set out accurately and in more detail in plaintiff's proposed findings. Generally, however, the court notes that in the immediate aftermath of the change of control, the new slate of directors (referred to hereafter as "Patriarch" Directors due to

their association with an LLC of financiers which had bought from Fleet National Bank its credit agreement with SOI) began exercising control in areas that had been the plaintiff's responsibility and under his power and control.  For example, Patriarch Director Schooley directed plaintiff to hire a consulting firm to review the company's operations. A few months later, another Patriarch Director, Michael Scinto, ordered plaintiff to fire the consultant plaintiff had engaged and retain yet another independent consultant. Still later, plaintiff was ordered, over his objections, to create a new management position (Chief Operating Officer) and to fill that position on an interim basis with the Ocean Ridge consulting firm. Then, still later, Patriarch Director Kevin Flannery directly negotiated the compensation of Paul Yantus, who was to fill a newly-created position, and ordered Yantus to develop a new business plan for the Business Process Outsourcing unit.  There was also unrefuted evidence that some members of the newly constituted Board of Directors made direct contact with members of the plaintiff's staff, directing those members to pay certain invoices, thus circumventing the plaintiff with respect to matters pertaining to cash flow.  One cannot plausibly contend there was not a serious reduction in plaintiff's power, status, authority, and responsibility in the wake of the assumption of control by the newly constituted Board of Directors.

There were also adverse changes to the plaintiff's incentive

pay and benefits following the change of control. In January 2005, Director Scott Schooley advised plaintiff that there would be a change in the way plaintiff's incentive pay would be calculated. This change in the way incentive pay was to be calculated made it more difficult for the plaintiff to earn a bonus. Whereas prior to the change of control, plaintiff's incentive pay was based solely on the company's earnings before interest, taxes, depreciation and amortization ("EBITDA"), under the new methodology, plaintiff's incentive pay now depended on satisfaction of a sales target for all divisions of the company, as well as EBITDA. Also in January 2005, SOI eliminated the benefit of the company's matching employee contributions to their 401(k) accounts, which constitutes a serious adverse change in plaintiff's benefits.

All the foregoing actions gave plaintiff good cause within the meaning of his employment contract to invoke his right to "Severance Compensation." On March 19, 2005 received a letter from plaintiff's counsel pursuant to Sections 19 and 25(h) of the employment agreement, expressing plaintiff's intent to resign and to receive severance compensation as provided pursuant to Section 13 of the employment agreement. That notice specifically referenced the adverse changes in plaintiff's duties, authorities, and responsibilities that followed in the wake of the change of control. It also referenced the adverse change in plaintiff's incentive pay calculation formula and the reduction in his 401(k)

benefits.  As required, the notice given by plaintiff's counsel expressed a willingness to enter into mediation. On receipt of the notice, Director Schooley called plaintiff, instructing him to turn in his keys and exit the premises.  Thereafter, no one from SOI contacted plaintiff regarding his offer to mediate, nor has plaintiff been paid any severance.

Section 13 of the employment agreement sets forth a mechanism for calculating severance compensation. Under the terms of the contract, the plaintiff has shown probable cause to believe he will recover compensation, interest, and attorney's fees totaling $1,890,000 at present. Compensation, interest at a specified rate referenced in <u>The Wall Street Journal</u>, and attorney's fees are specifically addressed under the employment agreement.  The court finds that the contemplated attorney's fee is reasonable for present purposes.

Generally, when one corporation purchases the assets of another corporation, the successor corporation is not responsible for the debts and liabilities of the predecessor. <u>Collins v. Olin Corp</u>., 434 F.Supp.2d 97, 102 (D.Conn. 2006).  However, a successor corporation may be held liable for the debts and liabilities of a predecessor when the former's acquisition of the latter is a mere continuation of the seller. <u>Ricciardello v. J.W. Gant & Co</u>., 717

F.Supp.56, 57-58 (D.Conn. 1989)(Dorsey, J.)[3]

"Under the continuity of enterprise theory, a mere continuation exists if the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers." <u>Chamlink Corp. v. Meritt Extruder Corp</u>., 96 Conn. App. 183, 188 (2006).

> Factors relevant to the mere continuation exception include continuity of management; continuity of personnel; continuity of physical location, assets and general business operations; and cessation of the prior business shortly after the new entity is formed. [Citation omitted] Also relevant is the extent to which the successor intended to incorporate the predecessor into its system with as much the same structure and operation as possible. [Citation omitted] Thus the court should determine whether the purchaser holds itself out to the world as the effective continuation of the seller." [Citation omitted].

<u>Bowen Engineering v. Estate of Reeve</u>, 799 F.Supp. 467, 487-88

---

[3] The undersigned cannot agree with SOL's successor liability arguments on the present record. (Dkt. #28 ¶¶24-50). This opinion, of course, is without prejudice to SOL's making the same or similar arguments in a motion for summary judgment on a more fully developed factual record.

Among other things, SOL stresses that SOI was not acquired directly by it pursuant to a traditional purchase agreement, but by a Foreclosure Agreement which specifically excludes liability for "[a]ny employment agreements, severance agreements or retention agreements." (Dkt. 28 ¶¶ 55-57). The court understands SOL's argument, but does not agree with it. That SOL attempted to expressly exclude liability under the agreement does not insulate it from a finding of probable cause under a continuing enterprise theory in the preliminary context of a prejudgment remedy hearing.

(D.N.J. 1992); also see Southern Connecticut Gas Co. v. Waterview of Bridgeport Ass'n., Inc., 2006 WL 1681005 (Conn.Super. Ct. June 1, 2006). Although the proponent of successor liability need not establish all of these factors, the balance must tip in its favor.[4] Bowen, supra 799 F.Supp. at 488. For present purposes, the court finds that plaintiff has established probable cause with respect to most, if not all, of the foregoing factors.

On August 5, 2005, three days after plaintiff commenced an arbitration against SOI, SOI transferred all of its assets and business to SO Acquisition, LLC, an entity which is wholly owned by Patriarch. SO Acquisition LLC in turn transferred SOI's assets and business to Scan-Optics, LLC ( hereafter "SOL"). Defendant's reply proposed findings of fact (Dkt. #31) indicate that the majority of the stock of SOI had been held by ARK CLO 2000-1 Limited ("ARK"), while the membership interests of SOL were owned by Zohar II 2005-1, Limited, and Zohar CDO 2003-1, Limited. Defendant LLC stresses that ARK does not hold any of the membership interests of SOL. While the court recognizes this contention, it is not sufficient to overcome a finding of probable cause with regard to corporate

---

[4] In an effort to focus the court on the equities (as SOL perceives them), the opposing papers stress that SOI did poorly under plaintiff's leadership; that it incurred heavy debt; and that plaintiff was part of the team that voted to incur SOI's heavy debt. (Dkt. #28 10-12, 28, 54). The employment contract which SOI entered into with the plaintiff, however, does not tie the plaintiff's salary, benefits, or severance to his performance. SOL is, therefore, hard pressed to argue that plaintiff is not worth what SOI agreed to pay him.

succession.

Under the continuity of enterprise theory, a finding of successor liability is not dependent on an exchange of shares. See Miller v. Forge Mench P'ship, Ltd., 2005 WL 267551 *8 (S.D.N.Y. Feb. 2, 2005) (mere continuation found when the individual shareholders of the creditor company acquired a debtor company through foreclosure sale after default). The current rule requires a weighing of the following four factors:

> (1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Collins v. Olin Corp., 434 F.Supp.2d 97, 103 (D.Conn. 2006). As this continuation test is a balancing test, it is not necessary for all of the factors to be met.

As part of the acquisition, it was agreed that SOI's employees would be hired by SOL and that the newly formed entity would hold the assets of, and operate the business formerly conducted by, SOI. SOL acquired the assets of SOI and assumed certain ordinary business liabilities. SOL also obtained from SOI the right to use the name "Scan-Optics" and a commitment that SOI would cease doing business and dissolve. SOI has since ceased doing business and has dissolved. Since August 5, 2005, SOL has continued to operate

without interruption the same general business formerly operated by SOI. SOL hired approximately 75 employees of SOI who reported to the same business location on Progress Drive in Manchester the day after the acquisition.[5]

Two of SOI's managers were hired as managers at SOL. Those managers and employees continued to work at the same job, performing the same functions at the same computers, at the same desks they used when they worked for SOI. Although SOL sold off the manufacturing division it has continued to operate a business focused on managing documents using image "capture and recognitions solutions." SOL continued to hold itself out to the public as "Scan-Optics." SOL's web site claims a continuity of business from 1968 to 2006.

SOL has continued business alliances begun by SOI. SOL has continued to attend industry conferences that SOI had attended. SOL has adverstised awards that had been won by SOI. SOL continued to provide scanning services to the types of customers that had been serviced by SOI. SOL continued to structure the company just as SOI had, with a Professional Services component, a BPO Sevices component, and an Access Services component. Although SOL grew

---

[5] It is true that SOL significantly downsized the operations of SOI. "[A]pproximately 30-40 former employees of Defendant SOI" lost their jobs. (Dkt. #28 ¶¶ 61-62). SOL also took steps to completely outsource the assembly of its scanning products, and began to dedicate significant resources to developing the company's BPO line of business.

its BPO component, plans for that growth were part of SOI's business plan.

The testimony of defense witness, Ramkumar Rajagopalan, SOL's former CEO, further assists plaintiff in establishing probable cause to support a determination that SOL has continued SOI's business with a continuity of management. The court, therefore, finds for present purposes that SOL is a continuation of SOI. There is likewise probable cause to support a determination that SOL has acquired SOI's liability to plaintiff under the employment agreement it entered into with with him.[6]

For all of the foregoing reasons, a writ of attachment in the amount of $1,800,000 should issue;

The plaintiff may attach or garnish to the value of $1,800,000 defendant Scan-Optics, LLC's interest in real or personal property, inventory, bank accounts, trust accounts, certificates of deposits,

---

[6]
The court finds that plaintiff has sustained his burden of showing probable cause. The undersigned specifically rejects SOL's Proposed Conclusions of Law 9-17, 19-23. (Dkt. #28).

SOL attempts to raise the defense of "unclean hands." There is no evidence that plaintiff has "unclean hands." In reality, what SOL is attempting to do under the guise of an unclean hands defense is capitalize on what it perceives to be generalized public resentment of highly-paid executives. This is unfair.

Similarly, there is no credible evidence that plaintiff engineered his own undoing in order to claim severance. Rather, the evidence is clear that after the change of control there were significant adverse changes in the scope and nature of plaintiff's power, responsibility, authority, and duties. The evidence is also clear that there were adverse changes to plaintiff's benefits and compensation after the change of control.

securities, bonds, debts owing, accounts receivable or other items of value, or in assets disclosed in response to plaintiff's motion for disclosure of assets, which is also granted;

A representative of the defendant, duly familiar with its assets will appear at a hearing at 2:00 p.m., September 24, 2007, before the undersigned to be examined under oath regarding those assets, unless counsel can agree to disclosure by deposition at some other convenient time and place. The parties will arrange for the presence and the payment of a stenographer irrespective of where or when the examination is held.

**Dated at Hartford, Connecticut, this 14th day of September, 2007.**

**/s/ Thomas P. Smith**
**Thomas P. Smith**
**United States Magistrate Judge**